Karen E. Ford Esq.
SW Ocean Ave & Mission, Suite 208
P.O. Box 287
Carmel-by-the-Sea, California 93921-0287
831-250-6433
Fax 831-250-6844
karen@fordslaw.com
SBN 092452
Attorney for Plaintiff Jeremy Gillette

UNITED STATES DISTRICT COURT

FOR THE DISTRICT COURT OF OREGON

PENDELTON DIVISION

| | |
|---|---|
| JEREMY GILLETTE, an individual, | Case No.: No. 2:24-cv-00948-HL |
| Plaintiff, | AMENDED COMPLAINT<br>Verified |
| vs. | Civil Rights Action - ORS 659A.199<br>Whistleblower Retaliation ORS 659A.203<br>False Claims Act 31 U.S.C.A. § 3730 |
| UMATILLA COUNTY FIRE DISTRICT #1;<br>JAMES C. FERRARIS; FERRARIS<br>INVESTIGATIONS & CONSULTING, LLC | |
| Defendants. | JURY TRIAL DEMANDED |

## **NATURE OF THE ACTION**

1.      Plaintiff brings this action to remedy violations of Plaintiff's rights under Federal

law and Oregon State employment law. Plaintiff seeks lost wages, compensatory damages,

equitable relief, applicable penalties, attorney fees, and costs.

## PARTIES

2.      Plaintiff Jeremy Gillette ("Gillette" or "Plaintiff") is a citizen of the United States and a resident of Hermiston, Umatilla County, Oregon.

3.      Defendant Umatilla County Fire District #1 ("UCFD1" or "Defendant") is a Fire District with main offices located in Hermiston, Oregon. UCFD1 provides fire, rescue, and emergency medical services for the citizens of the district, as well as ambulance service to the cities of Echo and Umatilla. At all relevant times, Defendant was Plaintiff's employer and its employees and supervisors, as their conduct is alleged herein, were acting within the course and scope of their employment with Defendant.

4.      Defendants James C. Ferraris; Ferraris Investigations & Consulting, LLC (hereinafter sometimes referred to jointly as "Ferraris") are engaged in the business of conducting investigations. Ferraris conducted and investigation of facts and events concerning Plaintiff and his employment which caused and led directly to termination of his employment.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiff's federal claims set forth in this complaint pursuant to 28 U.S.C. § 1331, including, without limitation, his claim under the False Claims Act 31 U.S.C.A. § 3730. This Court should exercise supplemental jurisdiction over the state law claims stated herein pursuant to 28 USC § 1367.

6.      This Court has personal jurisdiction over Defendant UCFD1 because Defendant's principal place of business is in Umatilla County Oregon, and because it conducts regular, sustained business activity in Umatilla County, Oregon and because the unlawful conduct alleged herein was committed in the District of Oregon.

7.      This Court has personal jurisdiction over defendant Ferraris Investigations & Consulting LLC because Plaintiff is informed and believes and alleges thereon that it does

business and has its principal place of business in this jurisdiction.  It operates in Oregon including in Umatilla County and it took the actions at issue in this action in Umatilla County, Oregon. Its conduct at issue in this action occurred in Umatilla County.

8.      This Court has personal jurisdiction over defendant James Ferraris as Plaintiff is informed and believes and alleges thereon that he is a resident of this jurisdiction and he operates a business in Oregon including in Umatilla County. His conduct at issue in this action occurred in Umatilla County.

9.      Venue is prior in this Court pursuant to 28 U.S.C. § 1391(b) because the claims arise in this Judicial District.

INTRA-DISTRICT ASSIGNMENT

10.      The appropriate assignment for this action is the Pendelton Division (Division 2) pursuant to Local Rule 3-2 because the Parties are all to be found within Umatilla County and most or all of the conduct complained of occurred there.

**FACTS COMMON TO ALL CAUSES OF ACTION**

11.      Gillette was formerly employed by UCFD1 for over eight years as an EMT-Paramedic/Lieutenant (EMT). Gillette started at Umatilla County Fire District #1 in June of 2014. Over the years of his employment he received excellent performance reviews and was promoted. As of 2022 was he had risen to the position of lieutenant and was being promoted to Battalion Chief effective January 1, 2023. As a lieutenant he was responsible to supervise and evaluate the work of other members of the department working under him and to counsel or warn subordinates in connection with their work.

12.      Gillette's Performance Review dated 12/20/2016 by Lt Ed Clark rated him as "Meets Standards" in all areas. The comments include the following:

> "You are able to perform patient care appropriately, using the proper protocols, **treating the patients with respect** and you write a pertinent narrative for the PCR. … You have a positive attitude… You are able to listen to all the facts and make a sound judgement when needed…. You are able to

3
Amended Complaint

take criticism and improve when needed, you fit in while on shift being able to communicate with all shift mates." (emphasis added)

13.    Gillette's Performance Review dated 12/20/2017 by BC Davis rated him as Meets Standards or Exceeds Standards in all areas. The comments include the following:

> "I have been impressed with Jeremy's ability to combine his experience as a firefighter and his family values into our guys. He has become a **role model and a, confidant for many of the guys**. I think he is **truly respected by all**…. Jeremy has always done well to foster a family environment on shift. The guys seem to have responded very well with his approach. He handles situations fairly, with an open mind…. Jeremy is also open to other opinions and differing reasoning's. Shows a lot of maturity in this regard…. **Jeremy has done very well with our probationary firefighters training. … Proven himself to be a solid leader**, … …..Jeremy is very personable. Likes to talk, prides himself in trying to figure people out. **Good rapport with all his subordinates**…. I believe Jeremy **has the respect of the guys**….He handles situations with **maturity and a level head**….Jeremy's experienced and maturity serve him well when dealing with conflicts." (emphasis added)

> The closing comment states:
> "Jeremy has done well stepping into the role of Lt. His love for training has really benefited the shift! . He has established **great rapport** with the firefighters, has become **like a father figure to many of the younger guys**. I have enjoyed having Jeremy on shift, when he is here the daily activities always run smooth." (emphasis added)

14.    Gillette's performance evaluation dated 2/24/2018 by BC Davis rated him as "Meets Standards" or "Above Standards" in all areas with the majority being "Above Standards". The comments included the following:

> "**Very competent company officer**. Done well when operating as BC21. Good command presence and thought process. … I have been impressed with Jeremy's ability to combine his experience as a firefighter and his family values into our guys. He **has become a role model and a confident for many of the guys. I think he is truly respected by all**…. He **handles situations fairly and with an open mind**. Jeremy always seems to have a good feel for the mood on shift. Proven to be a very competent Lt. … Confident in his decision making process. Jeremy is also open to other opinions and differing reasoning's. Shows a lot of **maturity** in this regard. … **Jeremy has done very well with our probationary firefighters training**. They all finished course work early with

his help…. Proven himself to be a **solid leader,** encourages the guys to think for themselves…. Jeremy is very personable. Likes to talk, prides himself in trying to figure people out. **Good rapport with all his subordinates….** I believe **Jeremy has the respect of the guys**. Firefighters from all shifts seem to seek him out for counsel on all types of scenarios…. He handles situations with maturity and a level head." (emphasis added)

15.    Gillette's performance evaluation dated 1/7/2019 by BC Davis gave him the

highest rating of Above Standards in all areas. The comments stated:

"Very competent company officer. Done well when operating as BC21. Good command presence and thought process. … **Jeremy is often sought out by the guys for advice. The guys on all shifts seem to value his opinion**. His leadership and family values continue to help him excel as a Lieutenant."… Jeremy has always done well to foster a family environment on shift. The **guys seem to have responded very well with his approach. He handles situations fairly, with an open min**d…. Confident in his decision making process. Jeremy is also open to other opinions and differing reasoning's. Shows a lot of maturity in this regard." (emphasis added)

Under Supervisory Duties in the 2019 performance evaluation he was rated as "Meets

Standards" or "Above Standards" in every area. The comments in this area included the

following:

"Jeremy is **good with the guys**, he always explains the reasons why we do something. He pushes the guys to be better. Able to reward and redirect well when improvement is needed…. Proven himself to be a **solid leader**, encourages the guys to think for themselves. … Jeremy is **very personable**. Likes to talk, prides himself in trying to figure people out. **Good rapport with all his subordinates**. … Jeremy has the respect of the shift. Positive leader…. He handles situations with maturity and a level head…. Jeremy's **experience and maturity serve him well when dealing with conflicts**." (emphasis added)

16.    In Gillette's performance review dated 1/8/2020 by Corey Gorham his manager

spoke about him in glowing terms.

"Jeremy is very comfortable performing in a company officer role."

"Jeremy maintains a positive and fun environment on shift but not at the expense of the districts readiness."

"Jeremy does a good job at motivating the company and others involved. He does so by keeping the work fun and providing a good example."

"Jeremy does a good job at relaying information to his company in a positive way and in a way that creates by in and understanding of the changes."

"Jeremy manages conflict without jumping to conclusions and tries to understand all side before coming to a decision."

"Jeremy has a way of delivering information to crews that is positive."

"Jeremy is a good resource to have on shift. He is a good company officer that understands the tactics employed on scenes. He **brings a positive and fun attitude to shift**. He desires to improve his knowledge and skills by seeking out shift training and making sure that it's a priority on duty. He **works well with others** during this training and provides for an environment that promotes learning. On his own doing he took on the Blazemark program and provided training to all shift. He is also the Rope Rescue Team Coordinator"


17.    Gillette's 2/3/2021 and 2/28/2022 performance reviews (both by Ed Clark) the form and rating system changed somewhat. Gillette was rated as 3 fair, 4 Good or 5 Excellent. None of the areas was rated as "Needs Improvement" or "Unacceptable". In fact, most of the ratings were Good or Excellent. Even in the specific areas applicable here the ratings and comments indicate no problems with Gillette's performance:

Communication and Attitude: The fire officer consistently maintains open communications with subordinates, supervisors and the public through formal reports, memo's, emails, phone, radio and verbal communications. Maintains a professional attitude when in public and at the stations. Demonstrates good listening skills, shows patience and is supportive in all communications.

2/3/2021 (By Edward Clark) rated as 3 Fair with no comments.


2/28/2022 (By BC Clark) "You always keep your supervisors in the loop, documenting appropriately also have the ability to communicate in a appropriate fashion." Rating 4 Good.

Leadership and Teamwork: Supervisor consistently demonstrates leadership skills and performs their role in a constructive and professional manner and displays a commitment to the team concept. Supervisor acts as a role model for others and accepts and supports team decisions.

2/28/2022 (By BC Ed Clark) "You have a ton of knowledge you just need to figure out a way to get it passed on to the shift during trainings and day to day operations." Again rated 3 Fair.

18.     Nothing in any of the comments in the performance reviews suggests any problem whatsoever in Gillette's treatment of others or communications with subordinates. In fact, Gillette was so outstanding that he was promoted to the position of lieutenant in March of 2017 and to the position of Battalion Chief effective January 1, 2023.

19.     In spring 2022 Gillette reviewing the projections for budgeting purposes used by UCFD. He noticed that the Fire Chiefs' report was misreporting the number of non-emergency transfers that UCFD1was taking and not taking. UCFD1 was reporting that it was turning down more transfers than it was by over reporting the number of requests which were received annually. UCFD1 then used this elevated number to create a monetary loss in that area of service. Gillette prepared a written report and a slide presentation highlighting this discrepancy and submitted it to management of UCFD1. Gillette made the presentation with the slides in April of 2022. After the presentation Gillette received feedback from Richard Cearns about it saying that it was considered offensive. Richard Cearns is an administrative chief of UCFD1 at this time but was the Div. Chief of Training in April 2022.

20.     UDFC1 used these figures in reporting to various agencies and to apply for funding such as the federal SAFER grants. Gillette concluded that these or similar inaccurate figures had been used in the past to support grant requests and other reports. The grants can be worth millions of dollars in funding staffing costs. It is Gillette's belief that UCFD1 had been using these false "losses" to apply for federal grants for staffing purposes.

21.     After Gillette exposed these inaccurate figures UCFD1 extraordinarily failed to apply for SAFER finding in the next cycle. The Staffing for Adequate Fire and Emergency Response Grants (SAFER) was created to provide funding directly to fire departments and volunteer firefighter interest organizations to help them increase or maintain the number of

trained, "front line" firefighters available in their communities. The goal of SAFER is to enhance the local fire departments' abilities to comply with staffing, response and operational standards established by the NFPA (NFPA 1710 and/or NFPA 1720). No fire department would ever forego applying for such funding as it is too valuable. The grants can be worth millions of dollars. Gillette believes and alleges thereon that UCFD1 avoided submitting applications for such funding because the fraud had been exposed.

22.    After his reporting of the budgeting discrepancies Gillette was suddenly subjected to unfair and discriminatory criticisms. He was subjected to a hostile work environment in which he was criticized unfairly and harassed in his work. This treatment was discrimination and retaliation for his reporting the budgeting discrepancies.

23.    After his reporting of the budgeting discrepancies and days before his promotion to Battalion Chief was to take effect on or about December 19, 2022 Gillette was called in and told he was on administrative leave but he was given no details of any accusation against him. He was notified that he was being investigated for alleged "bullying" "hostile work environment" "intimidation" and "physical contact". Gillette was shocked as he had never done anything like this and had never been counseled or told he had done anything wrong in his dealings with others. The notice did not explain what he was accused of doing or who were the individuals allegedly bullied or intimidated. The notice stated he had potentially violated the UCDF1 policy on harassment. He was placed on paid leave during the investigation. Gillette was expressly denied any union representation in this meeting. The notice did not provide any details of what the accusations against him were or who were the person or persons involved. This action by UCFD1 came as a complete surprise to Gillette. He had always been complimented for his professional treatment of others including subordinates. He had never been counseled or notified of any problems with his treatment of others. He had no idea what the accusations against him might be or who could be involved.

24.    UCFD1 representatives promised that any investigation would be kept completely confidential.

25.    Immediately after placing him on leave UCFD1 communicated to all employees and volunteers that he was banned from the workplace and under investigation. This information was promptly spread by those who received it from UCFD1 to others in the community. This was a disclosure of the supposedly confidential investigation. It also created a false impression that Gillette was guilty of some kind of fraud, theft or similar serious misconduct. These statements created a cloud on his professional reputation and career. There was no legitimate need to provide this information to these people and the impression created was severely damaging to Gillette and his personal and professional reputation.

26.    Gillette was provided with no details as to the accusation against him. He was barred from UCFD1 property and was told he could not discuss with anyone at UCFD1. He was deeply concerned and upset by the accusations and was prohibited from finding out anything about the accusations. This situation caused him severe emotional distress.

27.    Management of UCFD1 was well aware that the accusations against Gillette were false and were directly contrary to Gillette's job performance over the years.

28.    Gillette is informed and believes and alleges thereon that UCFD1 retained the services of FERRARIS to investigate the accusations against Gillette and to make recommendations as to what actions should be taken. UCFD1 was responsible to correctly assign duties to FERRARIS and to supervise his conduct. UCFD1 had an independent duty to conduct a fair and impartial investigation of any allegations against Gillette. FERRARIS eventually created a biased and false written report dated May 23, 2023 in order to justify Gillette's termination (hereinafter the "Report"). The Report was not provided to Gillette until on or about June 30, 2023. The supporting evidence such as audio recordings of witness interviews were not provided until on or about July 6, 2023. Gillette was forced to retain an attorney who made demands for this material in order to obtain it.

29.     The investigation was conducted in a biased, unfair, improper, and negligent
manner. It was not fair or neutral and was designed as an attack to get rid of Gillette. FERRARIS
delayed until on or about March 4, 2023 to even speak to Gillette. At this time Gillette learned,
for the first time, that the accusation involved a subordinate named Makiah Hampton. However,
even in that interview he was not provided with sufficient details as to exactly what the
accusations were as to what he had supposedly done or not done.

30.     In 2022 Gillette had been responsible for supervision and evaluation of a newly
hired employee, Makiah Hampton. Hampton was undergoing his probationary period. Gillette
counseled Hampton about problems with his performance including, without limitation, lack of
professionalism, rudeness with patients and others, and poor communication skills with
community members and other agencies. He also had an ongoing problem with failure to make
timely reports.  Hampton had been disciplined and given documented counseling sessions for
his behaviors which created complaints from local care providers.   After consulting with other
managers and with their agreement Gillette told Hampton that his position as
firefighter/paramedic was in jeopardy due to performance related issues and given that his
probationary period was close to ending. Gillette, as he was required to do as a supervisor,
counseled and warned Hampton about his treatment of others.   Hampton, apparently resenting
the counseling, complained to others, including his girlfriend and in so doing simply invented
accusations about Gillette.  These accusations were false.

31.     Gillette was never unreasonable or inappropriate with Hampton or anyone else in
the course of his work for UCFD1. The conclusions stated in the FERRARIS report were biased
and unfounded. Gillette believes that UCFD1 instructed FERRARIS to find evidence
unfavorable to Gillette, to attack his character and reputation and to reach conclusions that would
justify termination.

32.     In January 2023 , in order to try to understand the basis of the investigation
Gillette made a formal request for all records concerning his employment and concerning

Hampton's job performance. However, all that was provided were the performance evaluations for Gillette described herein. There were no documents produced concerning the accusations or the investigation at issue here of concerning Hampton's job performance.

33.    Gillette was not originally provided with a copy of the FERRARIS investigative report until a copy was included with the June 15, 2023 Notice that he was to be terminated. The copy of the Report he received did not have its attachments which were the evidence on which the report supposedly was based. These crucial materials were not provided until requested by Gillette. They were not finally produced until on or about July 6, 2023. His response to the report and was due on July 13, 2023 so Gillette did not have a fair opportunity to review the materials, gather his own evidence and respond.

34.    The Report is a biased and one-sided attack on Gillette intended to justify termination of his employment and to block his promotion to Battalion Chief. The Report generally amounts to nothing more than repetitions of Hampton's supposed complaints about his supervisor.  None of the witnesses was in a position to corroborate the negative aspects of Hamptons version of events.  No witness had direct knowledge of any physical contact between Gillette and Hampton. No witness had direct knowledge of any threat supposedly made by Gillette towards Hampton. At most, a few people said that Hampton had reported such things to them.  However, even the hearsay reports to others were not consistent, a fact which the Report fails to note or consider. The issue comes down to contradictory statements by Hampton and Gillette as to what transpired between them, As Gillette has a long and excellent history which includes no progressive discipline and no allegations of the kind raised here, his credibility would normally have been recognized and credited. As a short-term probationary employee with a documented record of inappropriate interactions with others, Hampton's version of events should not be credited. Also, Hampton told several different versions of specific events he alleges which belies his credibility. Gillette should not be terminated for simply counseling an employee reporting to him as he was required to do. Under normal circumstances a valuable

employee like Gillette would not have been terminated based such hearsay reports with a single source: Hampton.

35.     In the course of the improperly conducted investigation Defendants went so far as to attempted to recruit a former employee to participate in the investigation to attack Gillette's credibility and character. The employee's name is Gabe Billings. There were no complaints in the matter supposedly under investigation which concerned or involved Gabe Billings and he was not an employee at the time of any of the mentioned accusations. This action clearly reflects a search for any possible damaging accusation against Gillette rather than an impartial investigation of specific complaints. Another example of such "fishing for dirt" was that Ferraris went so far as to investigate whether Gillette threw a coffee cup at a former student named Mason Manary. No one, including Mason, said that this happened.

36.     At the same time the investigation deliberately and pointedly ignored information and evidence which would have cast doubt on Hamptons credibility and supported Gillette. For example, Hamptons credibility was not impeached when the District had firsthand and unsolicited information about Hamptons behavior. Cameron Kiokawa was an employee at the time and was a firsthand witness to Hampton's behavior and the instances for which he was counseled. Hampton was treated very differently from Gillette. For example, Cameron Kiokawa reported to the Operations Chief Jimmy Davis that he had knowledge of and witnessed calls for service in which Hampton gave larger than required IV's to patients that made him angry. This is a report of assault which Gillette believes received no attention from Defendants and no action was taken. None of this was considered by Ferraris during the investigation, or included in the investigative report.

37.     The investigative report is not neutral or unbiased. The investigator failed to consider key evidence including the disciplinary memo concerning Hampton and ignored Hampton's performance problems in dealing with others. He did not interview witnesses identified by Gillette. He presented the testimony in slanted and biased fashion. He did not

investigate the prior incidents involving Hampton at all.  Other key problems with the Investigative Report include, but are not limited to, the following:

>None of the incidents reported by Mr. Hampton (Blankenship) were witnessed by another person.
>
>None of the behaviors such as striking or choking have been noted by or witnessed by another person.
>
>The accusations that are discussed with other interviewees are noted as having been told to them by Mr. Hampton.
>
>Misconduct by Hampton was ignored
>
>Factors undermining Hampton's credibility and that of his girlfriend were ignored
>
>Hearsay was ignored
>
>Testimony and evidence in support of Gillette's version of events was ignored

38.    On or about June 15, 2023 UCFD1 sent a formal Notice of Potential Termination (hereinafter Notice) to Gillette stating its intent to terminate his employment. The Notice stated that the termination was based on the Report. The abrupt termination was unjustified as it was based on the false and misleading Report. The investigation itself was motivated by a desire by management of UCFD1 to get rid of Gillette and block his promotion to Battalion Chief. The Notice gave as the reason for the termination that Gillette had supposedly mistreated Hampton as stated in the Report.

39.    The Notice relied on the Report which was biased and filled with falsehoods. The Notice ignores the fact that the Report is largely based on hearsay statements. Reliance on hearsay is not consistent with due process requirements. The Notice and the actions of UCFD1 ignored the progressive discipline requirements applicable to Gillette. The UCFD1 Rules and Regulations provides specific details about progressive discipline.  For the infraction of "Threatening, intimidating, coercing, or interfering with other employees or supervisors on or off District premises." The following progressive discipline is provided.

1st Written warning

2nd Suspension up to 1 work day.

3rd 30 calendar day suspension and/or discharge

Thus, even if the Hampton accusations were taken as true, abrupt termination of Gillette with no prior progressive discipline would violate the UCFD1 Rules and Regulations. No other employee has ever been terminated by UCFD1 with no progressive discipline. This is totally incompatible with past practice of UCFD1.

40.    The Notice purported to base the termination of employment on alleged violation of EEO and Harassment Policies. The Harassment policy defines harassment as "unwelcome conduct based on "race, religion, age, gender, national origin, gender orientation or disability." The situation here does not involve any of these issues. Thus, they provide no support for termination of Gillette's employment.

41.    The grounds for termination stated in the Notice are unsupported. The first is a general statement about credibility. The conclusions stated are not valid and contain in accurate statements.  There is no justification given for crediting Hampton and his girlfriend and discrediting Gillette. There are witnesses who supported Gillette and his factual statements but are not mentioned in the report. There are specific reasons to question the credibility of Hampton as he was a probationary employee with a poor record and in danger of failing to complete probation. In addition, Hampton told different versions of key events at different times and to different  people. Such inconsistent statements seriously undermines his credibility.

42.    The Notice makes specific statements as to accusations against Gillette. However, these accusations are false and not supported by evidence.

43.    The Notice stated that UCFD1 intended to terminate Gillette's employment and that is what it intended to do regardless of what evidence or arguments Gillette might present.

44.    Gillette requested the ability to respond to the Report in writing to UCFD1 Chief Scott Stanton. If he had appeared in person the time that would be allotted was very short and it

would not allow time to present all of his evidence. UDCF1 would not agree to a longer meeting. Gillette was told he could not present witnesses or evidence and he could not question witnesses on which his termination was based. Prior to submitting his written response to the Report and protest of the termination.

45.    On or about July 7, 2023 Gillette was threatened by UCFD1 that if he did not resign, his certification for his job would be put at risk which would jeopardize his ability to pursue his career at all.  UCFD1 stated  "If [Gillette] resigns, the only box that must be checked is "resignation."  If this moves to termination, then DPSST will open its own investigation into this, putting his certifications at risk." The Oregon Department of Public Safety Standards and Training (DPSST) is responsible for certifications of members of fire services in Oregon, including the certifications allowing Gillette to work in his chosen field. At the time the head of DPSST standards and training was, or at least had been, Chief Scott Stanton's girlfriend. As a result Gillette would not have had a fair or impartial review of the accusations against him, the Report and the evidence.  Gillette could not afford to put his future employment at risk.

46.    As a result of the threats from UCFD1 and the situation as a whole, Gillette had no choice but to submit a resignation. He submitted his resignation on July 13, 2023. Thereafter UCFD1 refused to take any position on the accusations or whether he would have been terminated. Gillette is sure, given the course of events and the unfairness of the entire process that  he would have been terminated had he not resigned and he would he been reported negatively to DPSST.

47.    Following his resignation Gillette asked for a determination as to the Notice and the Report from UCFD1. That request was refused. Following his resignation Gillette requested a name clearing hearing to permit him to defend himself from the accusations and the false statements in the Report. He wanted to salvage his professional reputation if possible. UCFD1 refused to allow such a hearing.

48.     UCFD1 informed Gillette that the Report and its supporting evidence are public records and would be made available to members of the public who request it. Thus, his career and professional reputation have been seriously damaged.

49.     The way in which UCFD1's actions towards Gillette were handled were different that its normal practices and policies. He was treated differently than other employees subjected to counseling or discipline. The investigation was not conducted in a fair, impartial or professional way. The Report and the Notice of Intent to Terminate were a severe overreaction even if the accusations were to be taken as true.

50.     Gillette accepted replacement employment. However, the position he took was at greatly reduced status and compensation than his position as Lieutenant or his position as Battalion Chief.

## FIRST CLAIM FOR RELIEF
**(ORS 659A.199 – Retaliation Against Whistleblower)**
**Against UCFD1**

51.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 50.

52.     Pursuant to ORS 659A.199 and ORS 659A.203, it is unlawful employment practice for an employer to retaliate against an employee because the employee has in good faith reported information that the employee believes is evidence of a violation of federal or state law, rule or regulation.

53.     Plaintiff reported in good faith what he believes was evidence of violations of state and federal laws, rules or regulations to Defendant, including, without limitation, the following:

      a.   That he believed Defendant made misstatements concerning budgeting figures which he reported to UCFD1 management;

      b.   That with intent to defraud, UCFD1 created or confirmed another's false impression of law, value, intention or other state of mind and failed to correct a false impression that was previously created or confirmed in violation of ORS 164.085. Plaintiff reported this to UCFD1 management;

      c.   That Defendant made false statements in order to obtain public funds in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733. Plaintiff reported these concerns UCFD1 management;

      d.   That Defendants committed common law fraud by intentionally misrepresenting material existing fact with knowledge of its falsity.

54.     By making such reports, Plaintiff engaged in protected activity.

55.     Plaintiff's reports and conduct were a substantial factor in Defendant's decision to take adverse employment actions against Plaintiff, including an investigation, suspension and, ultimately, Plaintiff's constructive discharge. The investigation, the Report, and the Notice of Intent to Terminate, the threats to damage Plaintiff's certifications were an effort to get rid of Gillette and to block his promotion to Battalion Chief.

56.     As a result of Defendant's unlawful actions, Plaintiff suffered and will continue to suffer economic damages in the form of lost wages, including back pay, front pay in lieu of reinstatement, and is entitled to recover such lost wages in an amount to be determined at trial.

57.     Defendants unlawful actions alleged herein were undertaken with malice and were done intentionally and without just cause or excuse. Defendant's conduct was has shown a reckless and outrageous indifference to a highly unreasonable risk of harm and has acted with a conscious indifference to the health, safety and welfare of others. Accordingly Plaintiff is entitled to an award of punitive damages. Plaintiff seeks punitive damages in the amount of $1,000,000.

58.     As a result of Defendant's unlawful actions, Plaintiff experienced non-economic damages. Plaintiff is entitled to recover non-economic damages in an amount to be determined at trial, but which is alleged to be not more than $1,000,000.

59.     Plaintiff is entitled to his costs, disbursements, pre- and post-judgment interest in the amount of 9% per annum, and reasonable attorney fees incurred herein pursuant to ORS 659A.885 and ORS 82.010.

**SECOND CLAIM FOR RELIEF**
**( 31 U.S.C.A. § 3730 – Retaliation Against Whistleblower)**
**Against UCFD1**

60.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 59.

61.     As set out above, Gillette discovered that UCFD1 was misrepresenting budget and usage information in reports and in applications for grants and other funding. Gillette reported this to management of UCFD1 including the slide presentation. The Plaintiff's actions and statements alleged herein were lawful acts done in furtherance of the False Claims Act, 31 USCA § 3730.

62.     Defendant was aware of his protected activity because, as described herein, statements, information, and reports were directed to management and a slide presentation was made in a meeting in which management was present.

63.     Plaintiff is informed and believes and alleges thereon that the Defendant, directly and indirectly, receives funds from the federal government. As set out above these include, without limitation, federal SAFER grants. Plaintiff further alleges on information and belief that UCFD1 submitted falsified and misleading information in its efforts seeking federal grants and other funding.

64.     Plaintiff is informed and believes thereon that his conduct, investigation, reports and statements described herein were the reason that Defendant suspended him, ordered the

highly damaging investigation and Report, blocked his promotion to Battalion Chief, and was in the process of terminating his employment.   Plaintiff was suspended and constructively discharged in violation of 31 USCA § 3730.

65.    As a result of Defendant's unlawful actions, Plaintiff suffered and will continue to suffer economic damages in the form of lost wages, including back pay, front pay in lieu of reinstatement, and is entitled to recover such lost wages in an amount to be determined at trial. Defendant is also entitled to reinstatement to his former position.

66.    As a result of Defendants' acts of retaliation Plaintiff is entitled to an award of twice the amount of his lost wages.

67.    As a result of Defendant's unlawful actions, Plaintiff experienced non-economic damages. Plaintiff is entitled to recover non-economic damages in an amount to be determined at trial, but which is alleged to be not more than $1,000,000.

68.    Plaintiff is entitled to his costs, disbursements, pre- and post-judgment interest in the amount of 9% per annum, and reasonable attorney fees incurred herein pursuant to 31 U.S.C. § 3730(h)(2).

### THIRD CLAIM FOR RELIEF
**(Negligent Investigation)**
**Against UCFD1 and FERRARIS**

69.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 68.


70.    Plaintiff believes and, based on the circumstances and conduct described herein, alleges that UCFD1 retained FERRARIS for the purpose of building evidence to justify termination of Gillette's employment. The assignment to FERRARIS was to gather information and write a report to justify termination of Gillette's employment.

71.    The Investigative Report is not neutral or fair and relies on speculation, rumor, and hearsay. The Investigative Report states, generally without specific details that witnesses confirmed the accusations by Hampton against Gillette. However, this is not the case. In general,

the testimony of other witnesses referred to is merely the witness reporting that Hampton told them about his accusations. the summarizing of the testimony of witnesses is not fair or neutral. The summaries do not accurately reflect what the witnesses actually said. Sometimes the testimony is summarized inaccurately.  In other situations the statements are cherry picked or taken out of context to create a different impression than what the witnesses actually said.

72.    The Report devolved into a fishing expedition searching for any kind of dirt on Gillette. Among other aspects, this is reflected in the fact that FERRARIS questioned individuals who admittedly had no knowledge about any interactions between Gillette and Hampton.

73.    The Report mischaracterizes the text messages between Hampton and his girlfriend Kearns. The Report mentions the text messages between Hampton and his girlfriend as supporting Hampton's version of events. In fact, on that point they are merely more hearsay. However, what they do clearly reflect is a plan by Hampton and Kearns to try to get rid of Gillette because his counseling was a threat to Hampton successfully completing his probation. The text messages clearly establish that Hampton and Kearns were planning how to get Gillette into trouble.

74.    The investigator failed to fully investigate the pertinent issues. The Investigator completely failed to investigate highly significant issues. One key issue here is whether the counseling meetings between Gillette and Hampton were justified. Gillette submits that Hampton had series performance problems that centered on his inappropriate and rude interactions with others. This would explain the private counseling meetings described derisively by the investigator as "closed door". It would also provide evidence that it was Hampton, not Gillette, who was prone to rude outbursts.   The investigator totally failed to investigate the validity of Gillette's assertions and whether Hampton was frequently rude, disrespectful and inappropriate. The instances involving Hampton were completely ignored. Given the demonstrated tendency of Hampton to be rude and confrontational this would have affected the final determination particularly as to credibility.

75.     The biased nature of the investigation is also clear from the fact that the investigator asked multiple witnesses in leading ways inviting them to attack Gillette's history of truthfulness. He asked over and over of multiple witnesses if they had any reason to think Gillette had ever in all the years of his employment had lied about anything. He did not ask any similar questions about any other witnesses or investigate the reputation of any other witness, including Hampton.

76.     The Investigator failed to review or consider the performance reviews for Gillette discussed herein or his excellent work history and history of supervising firefighters and particularly probationary employees. He failed to take into consideration years of performance reviews evaluating Gillette as an officer who had excellent rapport with subordinates and describing him as a role model.

77.     The investigator failed to even note that it was Gillette's job to issue counseling and warnings to probationary employee Hampton. The context of the events is totally left out of the findings.

78.     Gillette provided the investigator with names of witnesses who would support his version of the events in the various incidents. However, the investigator failed to interview these witnesses.

79.     The investigator went out of his way to try to find anyone who would say bad things about Gillette's credibility. He did not similarly investigate any other witness.

80.     A properly conducted workplace investigation should be limited to a specific event or set of events or conduct. The investigator should not engage in a fishing expedition searching for adverse information on the subject. Notably the investigative report does not include a copy of any written complaint or even a description of what Hampton's complaint was. However, it is beyond question that the investigator went well beyond any complaint by Hampton and went to gather information and report on events that had nothing to do with

Hampton and were not improper and not the subject of any criticism or counseling of Gillette at the time.

81.    FERRARIS  failed to question key witnesses identified by Gillette to support his version of events. The investigator made no effort to obtain evidence from these witnesses. Also, the investigator failed to question Hampton about the details of his accusations so they could be verified or disproven. For most of the accusations Hampton was very vague and did not provide details such as time place those present or possible documentation. FERRARIS made no effort to locate documentation that concerning Hamptons accusations.  FERRARIS failed to even review all of the performance reviews of Lt Gillette.

82.    In conducting the investigation FERRARIS was acting on behalf of and as an agent of UCFD1. UCFD1 is responsible for the conduct of the investigation. UCFD1 gave the assignment to FERRARIS and is responsible for the scope and direction of the investigation.

83.    FERRARIS and UCFD1 failed to provide Gillette with sufficient information to allow him to gather and present evidence in his own defense. The way in which the investigation was conducted deprived Gillette of a fair opportunity to gather evidence in support of his position. The decision to notify Gillette of its intent to terminate him was issued before Gillette had knowledge of the specifics of the accusations or a fair opportunity to present his side.

84.    UCFD1 owes a duty of care to Gillette to act in good faith and to base adverse employment actions on reasonable grounds and evidence. If an investigation is to be conducted UCFD1 has a duty to assure it is conducted in a proper, impartial, and unbiased manner according to established standards for workplace investigations.

85.    Presenting itself as a professional in workplace investigations and having been retained to conduct a fair and impartial investigation of any allegations against Gillette, FERRARIS owed a duty of care to conduct the investigation in a fair impartial and proper manner.  The potential and foreseeable damage to Gillette if not properly conducted also created

a duty of care on the part of FERRARIS towards Gillette. The harm to Gillette form an improperly conducted investigation was foreseeable.

86.    Gillette was an intended beneficiary of the agreement between UCFD1 and FERRARIS which created a duty on the part of FERRARIS to conduct the investigation in a fair, impartial and professional manner. For this reason also FERRARIS owed a duty to Gillette.

87.    UCFD1 and FERRARIS breached their duty to failed to conduct the investigation in a fair, impartial, and proper manner.

88.    The conduct of the investigation and the Report are highly damaging to Gillette and harmed his career and his ability to pursue his career in the future. The harsh, one-sided, and damaging statements in the Report and the Notice, which are now public records, are unwarranted and not supported by evidence.

89.    As a result of Defendant's unlawful actions, Plaintiff suffered and will continue to suffer economic damages in the form of lost wages, including back pay, front pay in lieu of reinstatement, and is entitled to recover such lost wages in an amount to be determined at trial.

90.    Plaintiff is entitled to his costs, disbursements, pre- and post-judgment interest in the amount of 9% per annum, and reasonable attorney fees incurred herein

## FOURTH CLAIM FOR RELIEF
### Interference with Economic Opportunity
### Against FERRARIS

91.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 90.

92.    Gillette had an ongoing contractual employment relationship with UCFD1 and Defendant FERRARIS knew of the employment relationship.    Gillette had invested years of effort in his career at UCFD1 and had an excellent performance record.

93.     By the actions described herein and motivated by personal animosity and retaliatory motive as set for the herein, Defendants intentionally interfered with the contractual relationship between Gillette and UCFD1. The acts of interference included, without limitation the following: conduct of the investigation in a negligent and biased manner; preparing the Report which was filled with false and misleading statements and conclusions; misrepresenting the evidence in the Report; communications to UCFD1 about Gillette; the selection of interviewees and questions to be asked to skew the report against Gillette; failing to report any positive or exculpatory facts or information received concerning Gillette; disclosing the false and damaging accusations to the interviewees and others in the course of the investigation; failing to assure that the nature of the accusations was not disseminated to others; ignoring and leaving out the facts and evidence that would put Gillette in a good light; misleading statements to UCFD1 concerning Gillette's conduct both in the Report and otherwise; and refusing to consider evidence and facts presented by Gillette.

94.     As a result of Defendant's unlawful actions, Plaintiff suffered and will continue to suffer economic damages in the form of lost wages, including back pay, front pay in lieu of reinstatement, and is entitled to recover such lost wages in an amount to be determined at trial.

95.     Plaintiff is entitled to his costs, disbursements, and pre- and post-judgment interest in the amount of 9% per annum.

96.     Defendant, in undertaking the actions alleged herein, acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm to Plaintiff and has acted with a conscious indifference to the safety and welfare of Plaintiff. Accordingly, Plaintiff is entitled to an award of punitive damages and seeks an award of punitive damages in an amount of not more than $1,000,000 dollars.

## FIFTH CLAIM FOR RELIEF
### Defamation Per Se

97.      Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 96.

98.      As set out above Defendants made false and misleading statements about Gillette that defamed him in his career and profession. These false statements include, but are not limited to, the following:

    a.  Statements to employees and volunteers about the investigation and Gillette's leave of absence

    b.  The content of the report of investigation including, without limitation, accusations that Gillette was abusive to a subordinate and accusations of false testimony on Gillette's part

    c.  Statements made to witnesses as part of the investigation suggesting Gillette is dishonest and untruthful and is abusive to subordinates

    d.  Statements in the letter giving notice of intent to terminate including, without limitation, statements that Gillette was abusive to a subordinate and is untruthful and dishonest

99.      Defendants made these false and misleading statements with knowledge that they were false or with reckless disregard as to their truth or falsity. Defendants acted with malice as reflected in the manner of the investigation; Ferraris' report contains many intentional misstatements, partial quotes, and quotes taken out of context all of which have the effect of falsely and maliciously painting Plaintiff as a lying, dishonest, abusive and incompetent firefighter, EMT and supervisor.

100.      Defendants published the false statements when they were disclosed to other employees and volunteers in communications about the investigation. The false statements were

also published because they became part of the public record and are subject to disclosure to the public on request.

101.    In making the false and defamatory statements defendants acted intentionally and with malice in retaliation for the reports by Gillette of the discrepancies in the budget. In undertaking the actions alleged herein, Defendants acted with malice or have shown a reckless and outrageous indifference to a highly unreasonable risk of harm to Plaintiff and has acted with a conscious indifference to the safety and welfare of Plaintiff. Furthermore, that Defendants acted with malice is reflected in the manner of the conduct of the investigation; the investigative report and notice of intent to terminate contains many intentional misstatements, hearsay statements, partial quotes, and quotes taken out of context all of which have the effect of falsely and maliciously painting Plaintiff as untruthful, dishonest and abusive in his role as a supervisor EMT.

102.    As a result of Defendant's defamation, Plaintiff suffered and will continue to suffer economic damages in the form of damage to his reputation and career.  His reputation and career as a manager and supervisor has been damaged. He also suffered loss of his employment with UCFD1 resulting in lost wages and benefits and loss of his promotion to Battalion Chief. Plaintiff also seeks compensatory damages in an amount to be proven at trial for pain and suffering due to mental anguish, humiliation, loss of self-esteem and dignity as well as any other relief the court sees fit to order. Plaintiff also seeks punitive damages against Defendant Ferraris for his intentional and malicious conduct.

103.    Plaintiff is entitled to his costs, disbursements, and pre- and post-judgment interest in the amount of 9% per annum.

104.    Defendant Ferraris, in undertaking the actions alleged herein, acted with malice or has shown a reckless and outrageous indifference to a highly unreasonable risk of harm to Plaintiff and has acted with a conscious indifference to the safety and welfare of Plaintiff.

Accordingly, Plaintiff is entitled to an award of punitive damages and seeks an award of punitive damages in an amount of not more than $1,000,000 dollars.

**SIXTH CLAIM FOR RELIEF**
**29 USC 1983 Due process Property Right to Employment**
**Against UCFD1**

105.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 104.

106.    UCFD1 is a public agency. UCFD1 is a Rural Fire Protection Special District established under Oregon Revised Statute Chapter 478 and it is funded through real property taxes assessed by the Umatilla County tax assessor and the Oregon Department of Revenue

107.    As an employee of this government entity, Gillette had a constitutionally protected property right in his employment with UCFD1. Based on the written agreements, the applicable rules, policies, and practices and the specific representations and acts by representatives of UCFD1, he had an expectation that his employment would continue and could be terminated only for just cause and after a hearing. He also had an expectation of ongoing employment based on positive evaluations, promotions and statements by management of UCFD1.

108.    Pursuant to the Fifth Amendment to the Constitution UCFD1 cannot deprive Gillette of his property rights without due process of law, including both substantive and procedural due process. Pursuant to 42 U.S.C. 1983 Gillette seeks recovery for the deprivation of his constitutional rights.

109.    The actions of Defendants described herein were undertaken under color of law. The Chief Scott Stanton is the final decision and policy making authority within UCFD1.

110.    Gillette had a substantive due process right to be terminated only for just cause. There was not just cause for his termination.

111.    Gillette had a procedural right under his employment agreement, under the policies of UCFD1 and under constitutional law to a hearing before his termination became final. He was denied such a hearing. He also had a procedural right to present evidence, question witnesses and other aspects of a full and fair hearing. He was denied these rights.

112.    As a result of the actions of the Defendant UCFD1 as described herein, Gillette has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of professional reputation and status, humiliation, loss of career opportunity, emotional distress, and stress. Plaintiff has also incurred attorney fees and costs.

113.    UCFD1's actions against Gillette were undertaken motivated by evil motive or intent in that they were retaliation for his reporting of false statements in the budget reporting. Defendants' actions were undertaken with reckless or callous indifference to Gillette's federally protected rights. Gillette repeatedly asked for an opportunity to defend himself and protested against the accusations and the decisions taken with respect to him. However, his protests were disregarded and he was denied any fair opportunity to defend himself. Accordingly, an award of punitive damages is appropriate in this action.

## SEVENTH CLAIM FOR RELIEF
### 29 USC 1983 Due Process Liberty Right to Reputation
### Against UCFD1

114.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 113.

115.    Gillette has a liberty interest in his personal and professional reputation protected pursuant to the Fifth Amendment to the Constitution. The accusations, the investigation, and the REPORT led to termination of his employment and seriously damaged his personal and professional reputation and his career opportunities.

116.     Gillette had a due process right to a hearing to defend his reputation. The accusations by UCFD1 and FERRARIS included personal attacks on his honesty and integrity in addition to attacks on his professionalism and his job performance. All of these are now public records subject to disclosure on request. The process of the investigation and the termination of his employment caused these accusations to be spread throughout the community and to others in the firefighting community. The abrupt termination of his employment when others in the industry would have expected him to remain did damage to his professional standing and reputation in the firefighting community. As a result of this damage he and his family have suffered humiliation and embarrassment and his ability to pursue his chosen career has been seriously damaged. In addition, in order to truthfully respond to interview questions in the course of application for other positions Gillette will be forced to disclose and discuss the accusations. This self-publication also does substantial damage to his professional standing and reputation.

117.     As a result of the actions of the Defendants as described herein, Gillette has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of professional reputation and status, humiliation, loss of career opportunity, emotional distress, and stress. Plaintiff has also incurred attorney fees and costs of litigation.

118.     UCFD1's actions against Gillette were undertaken motivated by evil motive or intent in that they were retaliation for his reporting of false statements in the budget reporting. Defendants' actions were undertaken with reckless or callous indifference to Gillette's federally protected rights. Gillette repeatedly asked for an opportunity to defend himself and protested against the accusations and the decisions taken with respect to him. However, his protests were disregarded and he was denied any fair opportunity to defend himself. Accordingly, an award of punitive damages is appropriate in this action.

## EIGHTH CLAIM FOR RELIEF
### Negligent Retention and Supervision
### Against UCFD1

119.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1 through 118.

120.    As set forth above UCFD1 had a duty to assure that a fair, neutral, and proper investigation was conducted. The Defendant also expressly promised that the investigation would be conducted in a fair and impartial manner by a neutral outside investigator. In addition, UCFD1 had a duty to supervise the investigation adequately. It also had a duty to assure that Gillette was treated fairly and that his employment was not terminated except by following the proper procedures and after a fair hearing. Once UCFD1 embarked on the investigation it had a duty to see it through a proper conclusion and to make a fair final determination as to the accusations. UCFD1 had a duty in selecting FERRARIS and giving them assignments which could cause great harm to Gillette to make those selections carefully and appropriately.

121.    UCFD1 was negligent in the selection, retention, and failure to supervise FERRARIS.  FERRARIS was not sufficiently experienced in workplace investigations and was biased against Gillette. His experience was in conducting investigations to prove a particular point and not neutral or impartial investigations.

122.    The actions described herein are contrary to the actions that a reasonable employer would have undertaken in these circumstances.

123.    The negligent retention and negligent supervision alleged herein, was the proximate cause of damage to Gillette in the loss of his employment and damage to his professional reputation. The lack of a proper investigation led to the termination of his employment and deprived him of the opportunity to clear his name.

124.    As a result of the actions of the Defendants as described herein, Gillette has suffered lost compensation and employment benefits and has suffered other damage including, without limitation, loss of professional reputation and status, humiliation, loss of career opportunity, emotional distress, and stress.

## JURY DEMAND

Plaintiff demands a jury trial on all questions of fact or combined questions of law and fact raised in this Complaint as to which a jury is permitted.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the relief as set forth in this Complaint as follows:

1. Lost wages

2. An additional amount equal to lost wages

3. Reinstatement to his former position

4. Consequential damages

5. Non-economic damages

6. Punitive damages in an amount to be determined at trial

7. Prejudgment interest in the amount of 9% per annum

8. Attorney fees and costs

9. such other relief that the Court finds just and equitable.

Dated this 4th   day of August, 2024

_____

Karen E. Ford Esq.

Attorney for Plaintiff

## VERIFICATION

I, Jeremy Gillette, hereby declare and state:

I am the plaintiff in the above-entitled matter. I have read the forgoing Second Amended Complaint and know the contents thereof and the facts alleged therein. The facts alleged therein are true and correct to the best of my knowledge, except as to facts stated upon information and belief and as to those I believe them to be true.

I declare under penalty of perjury that the forgoing is true and correct.

Dated:   August4, 2024

JEREMY GILLETTE

32
Amended Complaint

## CERTIFICATE OF SERVICE

I am over the age of 18 and am not a party to the above-captioned matter.

On August 4, 2024 I served the documents listed below on all Defendants by electronic transmission via the Courts electronic filing system as follows:

Kurt C. Peterson, OSB #980065
kurt.peterson@harrang.com
Vivian Krupicka, OSB #123252
vivian.krupicka@harrang.com
HARRANG LONG P.C.
111 SW Columbia St., Suite 950
Portland, OR 97201

The documents served on August 4, 2024 are:

**AMENDED COMPLAINT Verified**

Dated this 4th  day of August 2024.

_____
Karen E. Ford Esq
Attorney for Plaintiff